JASPER BROWN, ADMINISTRATOR OF THE ESTATE OF LIDA T. BROWN, DE-
CEASED, v. CHARLIE HATCHER, ADMINISTRATOR OF THE ESTATE OF
MELISSA ETTA BROWN, DECEASED.

(Filed 26 August, 1966.)

**1. Executors and Administrators § 24a—**

Allegations that the personal services rendered decedent were under an
express contract to reimburse plaintiff therefor does not preclude recovery
on *quantum meruit* under an implied promise to pay for such services.

**2. Executors and Administrators § 24c—**

The relationship of mother-in-law and daughter-in-law does not raise
a presumption that personal services rendered by the daughter-in-law
were gratuitous.

**3. Executors and Administrators § 24a—**

In an action to recover for personal services rendered a decedent prior
to her death, plaintiff has the burden of showing, even in the absence of a
presumption that the services were gratuitous, that the circumstances
under which the services were rendered were such as to raise the infer-
ence that they were rendered and received with the mutual understanding
that they were to be paid for, and the circumstances must be such as to
put a reasonable person on notice that the services were not gratuitous.

**4. Same— Evidence held insufficient to show that personal services
were rendered under mutual understanding that they should be paid
for.**

The evidence tended to show that for some 30 years prior to her death
decedent and her son and daughter-in-law lived together in a house upon
land upon which decedent had a dower right, that although decedent
lived in rooms on one side of the house and the son and his family lived
in rooms on the other side of the house, the two parts of the house were
connected by a door, that the parties lived together as a single family,
and that in recognition of their mutual interdependence the daughter-in-
law and the mother-in-law each performed services for the other. The
evidence further tended to show that the daughter-in-law rendered duti-
ful and valuable services to the mother-in-law during the last three years
of the mother-in-law's life during which she was ill, but there was no
evidence that the mother-in-law made any promise or intimated that she
expected to pay for such services. *Held:* The evidence does not justify
the inference that the services were rendered and received under a mutual
understanding that they would be paid for, and nonsuit was proper.

**5. Same—**

Expressions of appreciation for kindnesses do not, without more,
amount to an implied promise to pay for personal services.

APPEAL by defendant from *Carr, J.,* 27 September 1965 Civil
Session of JOHNSTON.

This action was begun on 3 January 1964, by Lida T. Brown
to recover the value of personal services which she allegedly ren-
dered to her mother-in-law, Melissa Brown, defendant's intestate,

from 1937 until June 24, 1963, the date of Mrs. Brown's death. Plaintiff alleged that shortly after she and her husband, Jasper Brown, were married, they moved into the home occupied by Melissa Brown at her request and upon her promise that plaintiff would be compensated at her death for all services which plaintiff might render her during the interim. Answering, defendant denied the allegations of the complaint and the claim of plaintiff. Thereafter, on 12 August 1964, Lida T. Brown died and Jasper Brown, as her administrator, was substituted as plaintiff. At the trial, plaintiff sought to recover only for the services which Lida Brown had rendered her mother-in-law during the three-year period immediately preceding the latter's death on 24 June 1963. Plaintiff's evidence tended to show:

Jasper and Lida Brown were married a year before his father died, sometime "in the thirties." Prior to his marriage he had lived with his mother and father in the house where he was born. Jasper was one of six children, and when his father's real estate was divided among them, he got "two shares of his father's estate to look after Melissa." All or a part of his share was encumbered by his mother's dower. After his father's death, Jasper took his wife to live in the home with his mother, and he farmed his two shares. He grew tobacco on his mother's dower and paid her "standing rent" of $100.00 a year. That was "all she had to live on. (He) had to help her with the rest of what she got."

"Miss Melissa" occupied two rooms on one side of the house; Lida and Jasper occupied the two on the other side. There was a connecting door between the two living quarters. Plaintiff's five children were born there and grew up, as he had done, in that house. As they came along, Jasper made a room out of the back porch. Miss Melissa and his family got along "as good as anybody could." He did things for her, as he had done all his life, and she likewise did things for him. Until she died, "Miss Melissa was good to Jasper and the children and to Miss Lida throughout the time they lived in the house. . . . " They lived in the house together although Miss Melissa had her own kitchen. When the children were born she helped. They did things for her, and she did things for them.

At the time of her death, Miss Melissa was over 80 years old. During the three years before her death, however, she was not able to cook, wash, or clean for herself, and Lida did these things for her. For six months before she died she was bedridden. Lida carried food to her, cleaned her room, fixed her bed, gave her her medicine, and did for her what was necessary. During the last year and a half of Miss Melissa's life, Lida slept on a cot in the

room with her five nights out of the week. Miss Melissa often said that if it were not for Jasper and Lida she didn't know what she would do. Lida was good to Miss Melissa, who depended upon her.

Plaintiff's witnesses estimated that the value of the services performed by Lida for Melissa during the last years of Melissa's life was $30.00 per week. None of them ever heard Miss Melissa say that she wanted Lida paid for what she did for her, nor did anyone ever hear Lida say that she was making any charges for what she did for Miss Melissa, or that she expected to be paid.

Defendant's motion for a judgment of nonsuit at the close of plaintiff's evidence was overruled. Defendant then offered evidence which tended to show: During the last three years of her life, not only Jasper and Lida, but all of Miss Melissa's children waited upon her. The last year or two before Miss Melissa's death, Lida herself was in failing health from diabetes. Miss Melissa was in fairly good health and able to care for her own needs until about one month before her death when she had a fall. She was a person who wanted to do things for herself; her wants were few, and she did not require much waiting upon. During the last three years of her life she cooked many meals for herself, and warmed food which neighbors and her other children brought her on a hot-plate in her own kitchen where she always ate. Miss Melissa and Jasper's family got along well together. Over the years Lida did a lot for Miss Melissa, who did "a whole lot" for Lida, Jasper, and "their young'uns." Defendant's witnesses, like plaintiff's, never heard Lida say anything about expecting compensation for anything she did for Miss Melissa.

Defendant's motion for judgment of nonsuit made at the close of all the evidence was likewise overruled. Issues were submitted to the jury and answered as follows:

"1. Did the plaintiff's intestate, Lida T. Brown, perform services of value for defendant's intestate, Melissa Etta Brown, during the last three years of the life of the said Melissa Etta Brown under circumstances upon which an implied agreement arose that she was to receive compensation for said services?

"ANSWER: Yes.

"2. If so, in what amount is the defendant Administrator indebted to the plaintiff Administrator for said services?

"ANSWER: $3,040.00."

Judgment was entered upon the verdict, and defendant appeals assigning as error, *inter alia*, the denial of his motion for nonsuit.

*L. Austin Stevens; Wiley Narron; W. Kenneth Hinton for plaintiff appellee.*

*William I. Godwin; Britt & Ashley by William R. Britt for defendant appellant.*

SHARP, J.: Plaintiff offered no evidence tending to establish the express contract which his intestate had alleged. This failure, however, will not defeat his right to recover the fair value of those services if the evidence justifies the inference they were rendered under an implied promise to pay. *Thormer v. Mail Order Co.,* 241 N.C. 249, 85 S.E. 2d 140; *Grady v. Faison,* 224 N.C. 567, 31 S.E. 2d 760. The relationship of mother-in-law and daughter-in-law was not sufficient to raise a presumption that the services were rendered gratuitously, *Cline v. Cline,* 258 N.C. 295, 128 S.E. 2d 401, but if Lida did render them gratuitously, they may not be converted into a debt after the death of Miss Melissa. *Nesbitt v. Donoho,* 198 N.C. 147, 150 S.E. 875. Even when there is no presumption that the services were gratuitous, in order to recover for them, plaintiff must show circumstances from which it might be inferred that the services were rendered and received with the mutual understanding that they were to be paid for, that is, "under circumstances calculated to put a reasonable person on notice that the services are not gratuitous." *Lindley v. Frazier,* 231 N.C. 44, 46-47, 55 S.E. 2d 815, 816. *Accord, Johnson v. Sanders,* 260 N.C. 291, 132 S.E. 2d 582; *Twiford v. Waterfield,* 240 N.C. 582, 83 S.E. 2d 548.

This case is analogous to *Callahan v. Wood,* 118 N.C. 752, 24 S.E. 542, in which the plaintiff, a son-in-law, sued the estate of his mother-in-law for services rendered her prior to her death. He had lived with her in her house since the day he married her daughter. The "plaintiff's five children were born under her roof, all the parties rendering assistance to each other during the time. There was no agreement to pay either way, and nothing was paid, except in such mutual services." In reversing judgment for the plaintiff, Faircloth, C.J., said:

"Does the law imply a promise to pay the plaintiff for the services of himself and wife under these circumstances? . . . Is there any reason more favorable to a son-in-law, under the situation in the present case, where the relation of 'one family' was established and recognized by the parties until death, without any fact found or evidence tending to show that there was any intention on the one part to pay for the services or on the other part to charge for the same? The law does

not look favorably upon such after-death charges, in the absence of any intention between the parties prior to death.

"We do not put our decision entirely on the kinship relation, but also on the 'one-family' relation established and maintained by the parties and the entire absence of any intention to the contrary on the part of either party. We approve of the language of *Ruffin, J.*, in *Williams v. Barnes,* 14 N.C. 348, saying: 'Such claims ought to be frowned on by courts and juries. To sustain them tends to change the character of our people, cool domestic regard, and in the place of confidence sow jealousies in families.' *Hudson v. Lutz,* 50 N.C. 217; *Young v. Herman,* 97 N.C. 280." *Id.* at 757-58, 24 S.E. at 542-43. *Accord, Lindley v. Frazier, supra.*

Miss Melissa, Jasper and Lida lived in the same house, albeit she lived on one side and they on the other. The same door connected the two sides as it had always done; the old home had not been constructed as an apartment house. At the time for the trial, according to plaintiff, it was "about the same" as it was when he and Lida married over thirty years ago. "It was about rotted down then, and it is now." But, however mean the house, it was Miss Melissa's during her lifetime (G.S. 30-5, since repealed by Sess. Laws 1959, ch. 879 § 14), notwithstanding it was on one of the two shares allotted to Jasper "to look after Melissa." It cannot reasonably be said that Miss Melissa, Jasper and Lida, and their five children, all of whom were born there, lived as separate family entities in the old four-room homestead. If, in fact, Miss Melissa did always prefer the quiet of her own kitchen at mealtime to the noise of five children at her son's table, the preference is understandable. Yet, they were still one family. During the years when Miss Melissa was helping Lida with the five small children, it is inconceivable that her services were given or received with any idea of pecuniary compensation. In recognition of their mutual interdependence, they did things for each other. Surely, had Lida become ill and died while Miss Melissa was still able to work, she would have helped care for Lida and her family without expecting any recompense.

The evidence is plenary that Lida rendered dutiful and valuable services to her mother-in-law during the last three years of the latter's life, but, considering the *modus vivendi* of the two women throughout the previous thirty years, we can find nothing in the evidence which would have put Miss Melissa, or any other reasonable person, on notice that Lida had begun to charge her for services when her health failed three years before her death. It is noted that

while Miss Melissa often said that Lida was good to her, no witness ever heard her say that she wanted, or expected, Lida to be paid for what she did for her — and this despite the allegation in the complaint that Melissa "frequently reiterated her intention to compensate plaintiff for services. . . ." Expressions of appreciation for kindness do not, without more, amount to an implied promise to pay for it. *Johnson v. Sanders, supra.* Seldom indeed do we review a case of this nature in which, as here, evidence to sustain such an allegation is totally lacking.

We hold that plaintiff's evidence does not justify the inference that Lida's services to Miss Melissa were rendered and received with the mutual understanding that they were to be paid for. Defendant's motion for judgment of involuntary nonsuit should have been granted.

Reversed.